OPINION OF THE COURT
Diane Kiesel, J.
This case raises two questions concerning application of the recently enacted Uniform Child Custody Jurisdiction Enforcement Act (UCCJEA), set forth at article 5-A of the Domestic Relations Law: (1) whether (as the father urges) title 3 of that act requires this court to enforce a custody order issued by a court in the Dominican Republic, or (2) whether (as the mother and law guardian contend) this court may assume jurisdiction of the parents’ custody dispute and modify or replace the Dominican court’s order. After consultation with the original judge, consideration of the parties’ residence status, and in light of allegations of an extensive history of domestic violence that were not presented to the Dominican court before its default order of custody was entered, this court assumes jurisdiction and sets the matter for trial.
Family History
The subject children are the parties’ twin sons, born June 19, 1997 in the Dominican Republic. It is undisputed that the father obtained a default order of custody there in April 2002, an order appealed by the mother and affirmed by the Dominican court in October 2002, a month after she had brought the boys to the United States. In quick succession, the Integrated Domestic Violence Court — which has jurisdiction over both criminal and family law matters — received a criminal prosecution against the father based on his alleged November 8, 2002 threats to kill the mother; a writ of habeas corpus filed by the father on November 12, 2002 under article 6 of the Family Court Act seeking enforcement of the Dominican custody order; a petition for custody of the two boys filed by the mother on December 4, 2002 under article 6 of the Family Court Act; and a family offense petition filed the same day by the mother under article 8 of the Family Court Act, alleging additional acts of domestic violence.
A law guardian assigned on November 12, 2002 to represent the children reported an extensive history of domestic violence. Based upon this information, the court assumed temporary emergency jurisdiction under Domestic Relations Law § 76-c, *803 and directed the Administration for Children’s Services to interview both parents and the children.
Court Proceedings in the Dominican Republic
A review of the documents of the Dominican proceedings confirms that the mother and father separated in November 1998. At that time, pursuant to an agreement signed before assistant to the prosecutor Maria Hernandez, Esq., the father consented to the terms of an order of protection, agreeing to refrain from assaulting the mother verbally or physically, and to vacate the family home until the mother was able to find other housing. He agreed to pay child support, and was given regular visitations “as long as he behaves appropriately.” (See official translation, decision of Oct. 22, 2002, Judgment No. 447-2000-00506, Santo Domingo Appellate Court for Children and Adolescents, issued Oct. 22, 2002 [hereinafter Dominican Appellate Court], slip op, at 12.)
The mother left the Dominican Republic in December 1999, leaving the children with her mother, remarrying in June 2000. (See report, Administration for Children’s Services, dated Dec. 31, 2002, addendum [hereinafter ACS]; Dominican Appellate Court, slip op, at 8.) Just five weeks later, on August 2, 2000, while the mother was still in the United States, the father filed a claim for custody of the two children in the “Court of the First Instance for Children and Adolescents of the Distrito Nacional.” (See official translation of District Court decision and order, Judgment No. 447-2000-00506 [hereinafter Dominican District Court], slip op, at 6.) The maternal grandmother, who had physical custody of the children at the time, was named as defendant in the matter.
In a forensic report submitted to the Dominican District Court on November 10, 2000, the evaluator — who had interviewed only the father, as the mother was not in the country— concluded that he should have custody as the mother “is both physically and emotionally absent, and that the other family ties, according to the father, are not the most adequate for the children’s emotional or intellectual development. In this case, the father figure would be of vital importance, as such, we suggest beginning individual and family therapy to address some of the previously reported issues.” (Dominican Appellate Court, slip op, at 13-14 [emphasis added].)
On December 1, 2000, in the midst of the Dominican judicial proceeding, the mother temporarily ceded custody of their sons to the father, in a document known as a “friendly agreement,” *804 signed before the law guardian. The custody dispute thus came to a halt. (Dominican District Court, slip op, at 6.) It is not known why, or under what circumstances, the mother did this.
The “friendly agreement” states, as translated for this court: “First: The care and custody of the children Hector Jose and Jose Hector, 3 years of age respectively, will be with the father, Mr. Hector Galvan Susana, under the following conditions:
“1. Knowing the address and phone number of the home;
“2. That when I come, I may have my children without any problems and abiding by school days [szc];
“3. That my family may visit and telephone them;
“4. That if they are granted a green card, they may travel with me;
“5. Keep me informed of all that happens with my children;
“6. That they may visit my mother during vacations;
“7. That I be notified when Mr. Galvan travels so I may keep closer contact with them;
“8. Keep an amicable relationship with Mr. Galvan and that we respect each other’s private lives.” (Dominican Appellate Court, slip op, at 14, 1Í 6.)
In February 2002, the father reactivated the Dominican custody proceeding. In his request for a hearing he alleged that “the amicable agreement between the parties is not being adhered to.” (Dominican District Court, slip op, at 6.) The nature of the violation that prompted the father’s action was not specified. By that time, however, the mother apparently lived in the United States and had regular, though intermittent, contact with the boys.
Proof of service by mail to an address not specified in the part of the Dominican court record before this court was submitted to the Dominican court. (Dominican District Court, slip op, at 4.) The mother did not appear for the custody proceeding. In a decision dated April 17, 2002, the District Court found respondent in default for nonappearance and awarded full custody to the petitioner. (Dominican District Court, slip op, at 8.) Noting that the children had now been with their father for over a year, the court declined to move them again, citing the need for “stability and security in the future.” (Dominican District *805 Court, slip op, at 6.) The law guardian in the proceeding took the position that custody should be awarded to the father, noting that the mother “ceded custody of said children by means of an amicable agreement signed on the 1st of December of 2000,” and urged adherence to that agreement. (Dominican District Court, slip op, at 5.)
The mother, who asserts that she learned of the renewed custody proceeding only when she appeared in the Dominican Republic for a visit with the children in April 2002, filed an appeal on June 7, 2002 and inquiry was held in that court on August 7, 2002. In a decision dated October 22, 2002, the Appellate Court affirmed the grant of custody to the father. (ACS, addendum; Dominican Appellate Court, slip op, at 4.)
Proceedings in Bronx County
Two weeks after the Dominican appellate decision, on November 8, 2002, the father was arrested in Bronx County for threatening to kill the mother. He was charged with two counts of aggravated harassment in the second degree and related lesser offenses. He asserted to the Criminal Justice Agency (CJA), which interviews criminal defendants prior to arraignment for the purpose of advising the court on bail, that he had been “self-employed” full time as an “entrepreneur” in the Bronx for the past two years. He gave as his address 1268 St. Nicholas Avenue, New York, New York 10033. He represented that he had lived alone at that address during the prior year. He gave a different New York address to the arresting officer: 736 West 173rd Street in Manhattan. At arraignment on November 9, 2002, a full order of protection was issued in favor of the mother. Based in part on the father’s representations of community ties, he was released on his own recognizance and remains at liberty.
Almost immediately upon release, on November 12, 2002, the father brought a petition for writ of habeas corpus in Bronx County Family Court (Docket No. V-19646-7/02), alleging that the mother removed the children from the Dominican Republic in contravention of the final order of custody issued by the Family Court in Santo Domingo and affirmed on appeal. A law guardian was assigned to represent the children, and the matter was made returnable for the following day, November 13, 2002, in the Integrated Domestic Violence (IDV) Court, where the criminal matter was also now pending.
In response to the writ of habeas corpus, the mother appeared in the IDV Court with the children. Given the allegations of do *806 mestic violence and the lack of official, translated court documents from the Dominican proceeding, the children were allowed to remain with their mother pending further inquiry. The Dominican court documents were then sent for official translation.
On December 4, 2002, the mother filed a petition for custody with Bronx County Family Court (Docket No. V-20843-4/02). In that petition she alleged that, after she fled without the children to the United States in December 1999 to escape domestic violence, the petitioner took their children from her mother’s home without her permission and obtained a default order of custody from a court in the Dominican Republic. She also filed a family offense petition, alleging again that the father had threatened her life on November 13, 2002 (the day after he filed the writ of habeas corpus) and that he had displayed a gun, threatening to shoot her and the children (Docket No. 0-20815/ 02).
The parties again appeared in the IDV Court on December 9, 2002; the law guardian had now interviewed the children, and reported an extensive history of domestic violence in the family. The court assumed temporary emergency jurisdiction of the proceedings, pursuant to Domestic Relations Law § 76-c, and stayed enforcement of the Dominican custody decree. The children were again allowed to remain with the mother, pending investigation by the Administration for Children’s Services.
Results of the ACS Investigation
In a report to the court, an ACS child protective services worker recounted a history of severe domestic violence during the parties’ marriage in the Dominican Republic. The mother had medical records corroborating her claim of injuries at the hands of the father, and stated that the Dominican court had issued an order of protection in her favor. (See ACS § IIB [5].)
The address provided to CJA by the father, 1268 St. Nicholas Avenue, proved to be the offices of the Reyno Car Service, where a worker stated to ACS that while she did not know much about him, the father visited the offices when he was in New York City. (ACS § IIA [5].) In fact, the father did not make himself available to ACS for an interview until July 7, 2003. He asserted to the interviewing caseworker that the mother had “abandoned” the children in Santo Domingo in 2000 by moving to New York, leaving the boys with their maternal grandmother. (See report, ACS, dated July 7, 2003, at 2 [hereinafter ACS Update].) He claimed that she took the children to New York in *807 September 2002 in violation of a Dominican court order, and denied any history of domestic violence. (ACS Update at 2.)
The caseworker visited the school the boys attended this past school year in the Bronx. Their teacher described them as her “best students.” They had excellent attendance and were carefully monitored by their mother. (ACS Update at 2.) They appeared to be very happy with her, and were physically and emotionally healthy. Both boys stated to the caseworker that they were afraid to see their father, and that he had hit each of them in the past. (ACS § IIB [5].)
Annexed to the ACS report to the court was a multipage document describing chronologically, from the spring of 1996 to November 2002, approximately 25 incidents of domestic violence against respondent and the children. (ACS addendum.) It is unclear whether this chronology was authored by the caseworker as part of the ACS investigation or was perhaps prepared by someone else and appended to the report. These incidents allegedly involved physical, sexual, verbal and emotional abuse, extreme suspicion and jealousy, forced abortion, seizure of travel documents to prevent the mother’s departure from the Dominican Republic, and destruction of furniture and belongings. The mother was hospitalized for one week following an assault in 1996 allegedly committed by the father. She was three months pregnant with the boys at that time. According to the chronology, the mother obtained a Dominican court order of protection in November 1998. She had to relocate several times following issuance of the order. (Id.)
In December 1999, she relocated to the United States, leaving the boys in the care of the maternal grandmother. The father continued to harass her, threatening to take the children away from her if she did not reconcile with him. The mother asserts that she traveled four times to visit with the children during 2001, and was granted lawful permanent resident status in the United States in late September or early October 2001. The ACS addendum indicates that the father continued to abuse the mother during the summer of 2002. In June 2002, he allegedly became enraged when the mother’s current husband called during a visit, striking one of the boys in the head, inflicting injury. On another occasion, he appeared at the gate to the maternal grandmother’s home, brandishing a gun and making threats. When the mother returned to New York City that summer, she was forced to change her telephone number because of harassing phone calls from the father. In August 2002, the father *808 terminated health care coverage for the children. In September 2002, when the mother was again visiting in the Dominican Republic, the father stalked her. (Id.)
Intercourt Communications
On May 7, 2003, this court dispatched a letter to the Honorable Judge Antonia Josefina Grullon Blandino, the District Court Judge in the Dominican Republic who granted custody to the petitioner, seeking to determine whether she wished to retain jurisdiction of the custody matter. In a telephone conference held on June 25, 2003, Judge Grullon Blandino first referred this court to her response sent via facsimile, which had not yet been received. (See transcript of telephone call to Dominican Republic, June 25, 2003, at 2 [hereinafter telephone conversation].)
The following exchange took place between this court and Judge Blandino of the Dominican Republic:
“j. grullon blandino: . . . Really there is no conflict between the proceedings.
“the court: Okay, well I think . . .
“j. grullon blandino: It is a different matter. They are living over there now in the States, Mr. Galvan and Ms. Pascal.
“the court: Yes.
j. grullon blandino: They are living over there in the United States now.
“the court: She is. She is.
“j. grullon blandino: She—
“the court: The wife is.
“j. grullon blandino: Oh, that is different. Oh, I don’t know.
“the court: Well, I think the way we should proceed then is for us to review your fax since I have not seen it.
“j. grullon blandino: I think it is better you read what I said in the fax.
“the court: I think you are absolutely right.” (Telephone conversation at 2-4.)
Judge Grullon Blandino, who had to return to the bench, invited the court to contact her again if necessary and signed off.
In her letter dated June 23, 2003 and sent to the court via fax, Judge Grullon Blandino stated:
“The order 447-2000-00506 was issued when the *809 family was living in the Dominican Republic. Mr. Galvan and Mrs. Pascal signed prior to the order an agreement leaving the kids in their father’s custody until the mother was settled in the United States.
“There is no conflict between the proceedings in the matter of the twins Hector Jose and Jose Hector Galvan. If the parents are living now in the USA (Bronx) the court should proceed in both matters:
The custody and the criminal prosecution for acts of domestic violence.”
In a proceeding before this court on July 9, 2003, petitioner acknowledged that he is a lawful permanent resident of the United States, but contends, for purposes of the custody proceeding, that he is actually domiciled in the Dominican Republic. He necessarily admits, in making this assertion, that he was less than candid with the CJA in November 2002 when he gave his address as 1268 St. Nicholas Avenue in an effort to establish community ties that would justify release on his own recognizance. He remains silent concerning the basis for his assertion to the CJA that he was an “entrepreneur” who had conducted business in New York City for the preceding two years.
During the pendency of these proceedings, the father has had supervised visitation with the boys on three occasions through the Safe Horizon Center as well as regular telephone contact. The report to the court from Safe Horizon concerning the visits has been positive.
Discussion
I
Application of the Uniform Child Custody and Jurisdiction Enforcement Act
Determination whether this controversy should remain with this court or be returned to the originating court in the Dominican Republic is governed by the recently enacted Uniform Child Custody and Jurisdiction Enforcement Act, effective April 28, 2002 and replacing the former “Uniform Child Custody and Jurisdiction Act” (UCCJA). Set forth at article 5-A of the Domestic Relations Law, this statutory scheme is designed to eliminate jurisdictional competition between courts in matters of child custody. Jurisdictional priority, under the UCCJEA, is always conferred to a child’s “home state.” (See Hoff, The Uniform Child Custody Jurisdiction and Enforcement Act, Office of Juve *810 nile Justice and Delinquency Prevention, at 4 [US Dept of Justice, Dec. 2001]; UCCJEA Prefatory Note & Comments, Natl Conference of Commrs on Uniform State Laws, at 3-30 [1997] [NCCUSL].)
The legislative history of the UCCJEA establishes that domestic violence was very much on the minds of the drafters of the statute. While earlier laws had often presumed that the party fleeing the jurisdiction with children was the wrongdoer, experience showed that it was often a victim of domestic violence who sought protection in another jurisdiction. One important purpose of the UCCJEA was to bring that area of law into conformity with the Parental Kidnaping Prevention Act (28 USC § 1738A) and the “full faith and credit” requirements of the Violence Against Women Act (18 USC §§ 2265-2266; Legis Mem, Bill Jacket, L 2001, ch 386; 2001 NY Assembly Bill A 420). Domestic violence is also a factor to be considered when determining whether to retain jurisdiction in the United States in an international custody case under the International Parental Kidnaping Act (18 USC § 1204 [c] [2]), and can support refusal to repatriate a child. (Hague Convention on Civil Aspects of International Child Abduction, ch III, art 13 [b], TIAS No. 11670 [1983]; International Child Abduction Remedies Act, 42 USC § 11601 et seq.; see also Weiner, International Child Abduction and the Escape from Domestic Violence, 69 Fordham L Rev 593 [Nov. 2000] [discussing deficiencies of earlier laws against “parental kidnapping” in that drafters failed to foresee that majority of parents fleeing with children would be victims of domestic violence seeking safety]).
New York State, in particular, went beyond the language proposed by the NCCUSL drafters of the UCCJEA, enacting additional provisions that confer special protection for victims of domestic violence. In a statement of legislative intent that introduces the UCCJEA, the Legislature mandated that issuance and enforcement of child custody and visitation should be accomplished “in a manner that ensures that the safety of the children is paramount and that victims of domestic violence and child abuse are protected.” (Domestic Relations Law § 75 [2]; see also Sobie, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law art 5-A, 2004 Pocket Part, at 41.) New York’s statutory scheme requires a moving party to indicate, for example, whether “any proceeding has been commenced that could affect the current proceeding, including proceedings relating to domestic violence . . . and, if *811 so, identify the court, the case number, and the nature of the proceeding.” (Domestic Relations Law § 77-g [2] [e].) By implication, therefore, enforcement of a valid out-of-state decree may be affected by a new domestic violence proceeding.
Under title II of the UCCJEA, pursuant to a provision denying UCCJEA protection to a wrongdoer, a court cannot consider as a factor weighing against a party “any taking of the child, or retention of the child after a visit or other temporary relinquishment of physical custody, from the person who has legal custody, if there is evidence that the taking or retention of the child was to protect the [party] from domestic violence or the child or sibling from mistreatment or abuse.” (Domestic Relations Law § 76-g [4].) Unlike its predecessor statute, the UCCJEA was made applicable not only to other states but also to all foreign countries, even if the other jurisdictions have not themselves adopted it. (See Sobie, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 75-d, 2004 Pocket Part, at 61 [noting the “enormous” breadth of this provision, treating any foreign country as if it were a state of the United States, even in the absence of a reciprocal act in the foreign jurisdiction].) Foreign child custody determinations must be “recognized and enforced” so long as the determination was made “in substantial conformity with the jurisdictional standards of this article.” (Domestic Relations Law § 75-d [2].) The sole exception occurs only when the custody law of the foreign country, as written or as applied, violates fundamental principles of human rights. (See Domestic Relations Law § 75-d [3].) Notably, the mother does not attempt to raise any barriers pursuant to Domestic Relations Law § 75-d to recognition of the Dominican decree. We must assume, therefore, for purposes of this jurisdictional analysis, that there is a valid order of custody from the Dominican court.
We now consider (1) whether the UCCJEA requires immediate enforcement of the Dominican custody decree (as the father urges) or (2) whether, as the mother contends, this court may assume jurisdiction of the dispute and determine whether modification of the Dominican order is appropriate.
II
Enforcement of Foreign Decrees; Temporary Emergency Jurisdiction
Expedited enforcement of a child custody determination is available through Domestic Relations Law § 77-g (3), under title *812 III of the UCCJEA. Title III sets forth the proper procedure for registration of out-of-state custody decrees. (Domestic Relations Law § 77-d.) Once properly registered, a foreign decree will be treated as the equivalent of a decree of this state and, once registered, any further contest to the decree is precluded. (Domestic Relations Law § 77-d [3] [a]; [6].) The decree may be registered with a simultaneous request for enforcement. (Domestic Relations Law § 77-d [1].) Notably, these procedures were not followed here. Instead, the father filed a writ of habeas corpus under article 6 of the New York State Family Court Act, seeking immediate return of the child pursuant to the Dominican custody decree. At the time the father’s writ of habeas corpus was first returnable, however, English language translations of the court documents were not available to this court. There could be no presumption that the Dominican court order was valid and enforceable. Before translations were obtained, the mother had filed her own petition for custody under article 6 of the New York State Family Court Act, raising serious allegations of domestic violence directed against herself and the children.
This court assumed temporary emergency jurisdiction in order to investigate further the domestic violence allegations. (See Domestic Relations Law § 76-c [1] [“(a) court of this state has temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child, a sibling or parent of the child”]; see also In re Nada R., 89 Cal App 4th 1166, 108 Cal Rptr 2d 493 [2001] [considering temporary emergency jurisdiction under UCCJEA where mother retained children in apparent violation of custody order of Saudi Arabian court].)
Based on the presence of a criminal proceeding against the father, the filing of a new family offense petition, and the report of the law guardian that there was an extensive history of domestic violence in the family, this court stayed any enforcement proceedings until the underlying issues of domestic violence and the safety of the children could be resolved or a determination could be made that it was appropriate for this court to assume full jurisdiction of the matter.
Where, as here, there exists a custody order from another jurisdiction, it is incumbent that the temporary court contact the original court to “resolve the emergency, protect the safety of the parties and the child, and determine a period for the duration of the temporary order.” (Domestic Relations Law § 76-c *813 [4].) If the issuing court declines to retain jurisdiction because of significant connections between the child and the new state, the temporary court may assume permanent jurisdiction. That decision, however, is up to the original court, not the new. (See Sobie, Practice Commentaries, McKinney’s Cons Laws of NY, Book 14, Domestic Relations Law § 76-c, 2004 Pocket Part, at 122.)
Judge Grullon Blandino was contacted by letter May 7, 2003, and responded via a letter faxed to court staff on June 23, 2003. This court telephoned Judge Grullon Blandino on June 25, 2003, and held a conversation recorded by a court stenographer and with an official Spanish language interpreter present (although Judge Grullon Blandino conversed in English). The parties were provided with copies of each of these proceedings and permitted to submit papers with pertinent exhibits addressing the question of jurisdiction.
The result of the communication with the home state court was that the Dominican court declined to exercise jurisdiction. In her letter of June 23, 2003, the Dominican judge stated, in essence, that she viewed New York as an appropriate forum for resolution of this custody matter. In particular, she stated that prior to her issuance of her order, the parties signed an agreement “leaving the kids in their father’s custody until the mother was settled in the United States.” She concluded that there was “no conflict” between her ruling and the New York State proceeding. She further concluded that “[I]f the parents are living now in the U.S.A. [Bronx] the court should proceed in both matters: The custody and the criminal prosecution for acts of domestic violence.”
When this court spoke by telephone with Judge Grullon Blandino on June 25, 2003, she seemed less certain of her answer if only the mother was living in the United States, but then referred the court again to the substance of her letter. The father now urges that he is not a resident of the United States, and that Judge Grullon Blandino’s statement is therefore not conclusive on the question of whether the Dominican court views this action as more appropriately determined in New York State.
There is some confusion regarding the father’s residential status, a circumstance wholly attributable to his own inconsistent statements on this question. Of significant weight is the father’s own representation to the Criminal Justice Agency, in seeking to be released on his own recognizance following his ar *814 rest in Bronx County on November 8, 2002, that he had lived in the Bronx for the past two years as a self-employed “entrepreneur,” providing the interviewer with an address where he purported to reside. Moreover, he is admittedly a permanent resident of the United States, as are his children. This court will not permit the father to claim, on the one hand, that his significant community ties warrant the court’s trust that he will return as required to answer the criminal charges against him and, on the other hand, that he is such a stranger to this jurisdiction that it would be unfair to require him to litigate the question of custody here. Both claims cannot be true. One purpose of the Integrated Domestic Violence Court is to eliminate the ability of litigants to present different faces to different courts in an effort to manipulate the legal process. For purposes of this jurisdictional determination, this court will hold the father to his representation that, as a lawful permanent resident of this country, both his home and his work are here in the Bronx.
Ill
Modification Jurisdiction
Having found a basis for temporary emergency jurisdiction, it is now appropriate for this court to consider whether it should assume jurisdiction of this matter for consideration of the mother’s application for a change in custody. This inquiry is wholly separate from that for temporary emergency jurisdiction, and is governed by Domestic Relations Law § 76-b, “Jurisdiction to modify determination”:
“[A] court of this state may not modify a child custody determination made by a court of another state unless a court of this state has jurisdiction to make an initial determination under paragraph (a) or (b) of subdivision one of section seventy-six of this title and:
“1. The court of the other state determines it no longer has exclusive, continuing jurisdiction under section seventy-six-a of this title or that a court of this state would be a more convenient forum under section seventy-six-f of this title; or
“2. A court of this state or a court of the other state determines that the child, the child’s parents, and any person acting as a parent do not presently reside in the other state.”
This multilayered analysis, rather like a hall of mirrors, immediately refers the inquirer back to the provision governing *815 initial child custody determinations, Domestic Relations Law §76 (1) (a) or (b). Next, the inquirer is propelled to the provision governing exclusive, continuing jurisdiction, defined at Domestic Relations Law § 76-a. If both of those inquiries are satisfied, the court then turns to consideration of Domestic Relations Law § 76-f, the provision governing inconvenient forum analysis. Only then can a court conclude that jurisdiction properly lies in the new jurisdiction.
We now consider whether, under the first prong of this analysis, New York State could meet the requirements for initial jurisdiction set forth in section 76 (1) (a) or (b).
Paragraph (a) of Domestic Relations Law § 76 (1), setting forth “home state” jurisdiction, is not applicable here. Under Domestic Relations Law § 75-a (7), a jurisdiction does not become a child’s “home state” unless the child lived in the state with a parent for at least six consecutive months prior to commencement of the action. Here, the children left the Dominican Republic in September, and the custody action was commenced in December. The Dominican Republic, therefore, and not New York, is the children’s “home state.”
The UCCJEA expressly grants priority to the “home state” in resolving custody disputes. Indeed, recognition of the exclusive, continuing jurisdiction of the “home state” is one of the bedrock principles of the UCCJEA, intended to eliminate substantial confusion that arose under the UCCJA. (See Sobie, Practice Commentaries, McKinney’s Cons Laws of NY, Domestic Relations Law § 76-b, 2004 Pocket Part, at 113 [jurisdiction to modify].) Only the home state itself can decide that it will no longer exercise such jurisdiction. (See NCCUSL notes at 27-31.)
Under Domestic Relations Law § 76 (1) (b), however, a court could nevertheless assume initial jurisdiction if:
“(b) . . . a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under section seventy-six-f or seventy-six-g of this title, and:
“(i) the child and the child’s parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and
“(ii) substantial evidence is available in this state concerning the child’s care, protection, training, and personal relationships . . . .” (Emphasis added.)
Because the decision whether to decline jurisdiction only can be made by the foreign court, an important first step is com *816 munication between this court and the foreign court, as authorized by Domestic Relations Law § 75-i. Under that provision, in pertinent part,
“1. A court of this state may communicate with a court in another state concerning a proceeding arising under this article.
“2. The court may allow the parties to participate in the communication. If the parties are not able to participate in the communication, they must be given the opportunity to present facts and legal arguments before a decision on jurisdiction is made
“4. Except as otherwise provided in subdivision three of this section, a record must be made of a communication under this section. The parties must be informed promptly of the communication and granted access to the record . . . .”
As noted above, these communications took place pursuant to letter and via telephone in May and June of 2003. The result was that the Dominican court declined to retain jurisdiction of this matter.
While that decision by the Dominican court supported assumption of temporary emergency jurisdiction, that alone does not satisfy the more stringent standard of Domestic Relations Law § 76 (1) (b). We must next consider whether “the child and the child’s parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence”; and whether “substantial evidence is available in this state concerning the child’s care, protection, training, and personal relationships.” (Domestic Relations Law § 76 [1] [b] [i], [ii].)
The mother now resides in the Bronx with her new husband and their infant. The boys, who have lived with them for more than a year, are outstanding students in the New York City public school system. They are followed by a pediatrician in Bronx County. They are legal permanent residents of this country. Certainly this court can reasonably conclude that both the boys and their mother have “significant connections” with New York.
The court has already initiated contact between the Administration for Children’s Services and this family. A thorough report has been submitted to the court concerning the family background, the living conditions of the children, their performance in school, and their relationships with their half-siblings *817 and their stepfather. We also have reports from the supervised visitation center concerning the father’s most recent visits with the children. This court can conduct in camera interviews with the boys, if necessary.
In contrast, the Dominican court had available to it only a psychological report that filtered all results through the father’s perspective. The court made no reference to the family’s domestic violence history, even though the mother had obtained an order of protection. Since that time, a new criminal matter has arisen in this county. The additional information that would assist a court in making a current determination is in Bronx County.
To the extent that important information is located in the Dominican Republic, the UCCJEA authorizes this court to arrange for testimony to be taken in another state (or foreign country). (Domestic Relations Law § 75-j.) Witnesses can be deposed or testify by “telephone, audiovisual means, or other electronic means before a designated court or at another location in that state.” (Domestic Relations Law § 75-j [2].) Evidence that is transferred to this state by “electronic means” is expressly admissible. (Domestic Relations Law § 75-j [2].) This court is also authorized, in theory, to request the Dominican court to conduct proceedings in accordance with the UCCJEA, although the fact that the Dominican Republic is not a party to the interstate compact makes enforcement of this provision problematic. Under Domestic Relations Law § 75-k (1), this court can request another court to:
“(a) hold an evidentiary hearing;
“(b) order a person to produce or give evidence pursuant to procedures of that state;
“(c) order that an evaluation be made with respect to the custody of a child involved in a pending proceeding;
“(d) forward to the court of this state a certified copy of the transcript of the record of the hearing, the evidence otherwise presented, and any evaluation prepared in compliance with the request; and
“(e) order a party to a child custody proceeding or any person having physical custody of the child to appear in the proceeding with or without the child.”
Subdivisions (2), (3) and (4) allow this court to hold reciprocal hearings for another jurisdiction; to assess travel and other costs related to trans-jurisdictional litigation; and require pres *818 ervation of all court records until the child reaches the age of 18, as well as transfer of the records to another jurisdiction should an appropriate request be made.
In short, these provisions of the UCCJEA allow this court to minimize the prejudice to one party or the other caused by distance from important witnesses and other sources of information concerning the living circumstances of the children in the other jurisdiction.
We conclude that each of the four threshold inquiries has been satisfied. We now return to Domestic Relations Law § 76-b for determination whether the remaining statutory requirement can be met.
Having determined that the standards for initial jurisdiction under Domestic Relations Law § 76-b can be satisfied in this case, the court next must determine whether at least one of three additional inquiries can be satisfied. These are set forth at subdivisions (1) and (2) of Domestic Relations Law § 76-b:
“(1) The court of the other state determines it no longer has exclusive, continuing jurisdiction under section seventy-six-a of this title or that a court of this state would be a more convenient forum under section seventy-six-f of this title; or
“(2) A court of this state or a court of the other state determines that the child, the child’s parents, and any person acting as a parent do not presently reside in the other state.” (Emphasis added.)
Again, only one of those three factors needs to be found.
Subdivision (1) of Domestic Relations Law § 76-b is satisfied if “the court of the other state determines it no longer has exclusive, continuing jurisdiction under section seventy-six-a of this title or that a court of this state would be a more convenient forum under section seventy-six-f of this title.”
Domestic Relations Law § 76-a, cross-referenced in this provision, provides the definition of “exclusive, continuing jurisdiction”:
“1. Except as otherwise provided in section seventy-six-c of this title, a court of this state which has made a child custody determination consistent with section seventy-six or seventy-six-b of this title has exclusive, continuing jurisdiction over the determination until:
“(a) a court of this state determines that neither the child, the child and one parent, nor the child *819 and a person acting as a parent have a significant connection with this state and that substantial evidence is no longer available in this state concerning the child’s care, protection, training, and personal relationships; or
“(b) a court of this state or a court of another state determines that the child, the child’s parents, and any person acting as a parent do not presently reside in this state.”
Notably, the statute only requires the home court to determine that the child and “one parent” no longer have a significant connection with its state, and that substantial evidence is no longer available in the original state. The Dominican judge noted that the custody agreement anticipated that the children would relocate to the United States once the mother was settled here. The court also took note of the presence of a criminal prosecution in Bronx County that arose after its order of custody to the father. Therefore, it is now appropriate for this court to assume modification jurisdiction.
IV
Inconvenient Forum Analysis
Having concluded that this court has jurisdiction to modify the terms of custody, we must now consider whether jurisdiction should nevertheless be declined, either because (1) this state is an inconvenient forum or (2) a party engaged in unjustifiable conduct. (Domestic Relations Law §§ 76-f, 76-g.)
Domestic Relations Law § 76-f (2) sets forth the factors of an “inconvenient forum” analysis:
“(a) whether domestic violence or mistreatment or abuse of a child or sibling has occurred and is likely to continue in the future and which state could best protect the parties and the child;
“(b) the length of time the child has resided outside this state;
“(c) the distance between the court in this state and the court in the state that would assume jurisdiction;
“(d) the relative financial circumstances of the parties;
“(e) any agreement of the parties as to which state should assume jurisdiction;
“(f) the nature and location of the evidence required *820 to resolve the pending litigation, including testimony of the child;
“(g) the ability of the court of each state to decide the issue expeditiously and the procedures necessary to present the evidence; and
“(h) the familiarity of the court of each state with the facts and issues in the pending litigation.”
Whether domestic violence has occurred and is likely to continue in the future is perhaps the most important factor for the court in this case. Without calling into question the validity of the Dominican Republic custody decree, this court nevertheless finds it significant that the Dominican court’s order was issued ex parte, with no input from the mother.
We note that the sole forensic report prepared in 2000 as part of the initial custody proceeding, and given great weight by the Dominican court, was based solely on an interview with the father, who conveyed a highly negative image of the mother. His portrayal of the mother to that investigator as “abandoning” her children was very different from the history detailed in this state’s Administration for Children’s Services’ report, prepared in 2002, describing an extensive history of domestic violence, and a mother who reluctantly left her children with her own mother in order to flee the petitioner’s abuse. None of the mother’s side of this story appears in the Dominican court records, save for mention of issuance of an order of protection entered, on mutual consent, before the prosecutor in November 1998 that is noted as part of the record by the Appellate Court. (See Dominican Appellate Court, slip op, at 12.) Nor were recommendations to the Dominican District Court for individual and family counseling, made by a social worker who alluded to conflict in the family that may have affected the children, adopted by that court.
We note that, according to the most recent Department of State Country Report on Human Rights Practices for the Dominican Republic, found through its Web site at <www. state.gov/g/drl/rls/hrrpt/2002/18329.htm> (accessed Feb. 27, 2004), the Dominican Republic had no laws against domestic violence until 1997. Domestic violence is described as “widespread” in that country, affecting 40% of that country’s women and children. As of March 2003, there were “no functioning shelters for battered women.” (See Dominican Republic Country Report § 4 [released by the Bureau of Democracy, Human Rights and Labor, Mar. 31, 2003].)
*821 We may not conclude, on the information before us, that the Dominican court knew about or considered the domestic violence in this family at the time the custody determination was made. Nor does it appear that the Dominican court is now in a strong position to protect the respondent and the children from domestic violence or abuse in the future.
Additional factors which lead this court to conclude that New York is the more convenient forum for this controversy include: the fact that the boys have now been in this state for a year and are enrolled in school here, where they are regarded as outstanding pupils; the greater financial resources of the petitioner, making him better able to afford litigating this matter in a distant jurisdiction; the Dominican court’s assertion that the parties had agreed to have the children relocate here once respondent had settled; the fact that the father consented to the children obtaining legal permanent residency in the United States; the fact that this court has jurisdiction over a new criminal domestic violence matter in which petitioner is the defendant; the pending family offense petition against the father in which he is alleged to have violated this court’s order of protection; the extensive investigation already undertaken by the Administration for Children’s Services; and the availability of additional resources, such as supervised visitation facilities with therapeutic visitation services, that will assist the court in making an informed decision as to what custody arrangement is in the best interests of the children.
Unjustifiáble Conduct
We are required to consider, in making a determination whether to exercise jurisdiction to modify, whether even though jurisdiction could lie, it should nevertheless be declined “because a person seeking to invoke its jurisdiction has engaged in unjustifiable conduct.” (Domestic Relations Law § 76-g [1].) While “unjustifiable conduct” is not affirmatively defined, it does not include instances where a parent left the jurisdiction with a child because of domestic violence:
“In making a determination under this section, a court shall not consider as a factor weighing against the petitioner any taking of the child, or retention of the child after a visit or other temporary relinquishment of physical custody, from the person who has legal custody, if there is evidence that the taking or retention of the child was to protect the petitioner from domestic violence or the child or sib *822 ling from mistreatment or abuse.” (Domestic Relations Law § 76-g [4].)
The Dominican court placed no weight on the domestic violence in this family, awarding full custody to the father despite the existence of an order of protection. Moreover, this court now has pending before it a domestic violence criminal matter in which the father twice allegedly threatened to kill the mother, and a family offense petition in which the mother alleges additional death threats against her and the children — in violation of this court’s criminal court order of protection — as well as menacing with a gun. Certainly enough information has been presented to the court to warrant consideration of this exemption.
This court further finds it significant that, as part of the “friendly agreement” entered into by the parties on December 1, 2000, the father agreed that legal permanent residency in the United States would be sought for the children so that they could “travel” with their mother. The judge who presided over this matter in the Dominican Republic construed this agreement to mean that once the mother was settled in the United States, custody was to revert to her. If that is the case, there is — as the Dominican court noted — “no conflict” between the actions of the mother and the order of the District Court there, and certainly no “unjustifiable conduct.”
Conclusion
This court assumes jurisdiction to modify the Dominican Republic custody order. As noted previously, under Domestic Relations Law § 75-a (11), “modification” does not necessarily mean a change in custody, only that this court’s order, whatever it may be, will replace that of the Dominican court. Any measures requested by the parties, pursuant to Domestic Relations Law §§ 75-i, 75-j, and 75-k, to ease the difficulties of litigating a matter with history in two far-flung jurisdictions, will be readily entertained by the court and, where appropriate, granted, with court staff assisting in any way possible to implement these procedures.